UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KOVAN SADIQ MIZORI #691412,

                Petitioner,                       Hon. Robert Holmes Bell

v.                                        Case No. 1:11-cv-00455-RHB-PJG

MARY BERGHUIS,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted of two counts of assault with intent to commit murder, in violation of Mich. Comp. Laws § 750.83. He is serving concurrent sentences of 135 months to 30 years and 14 to 30 years, respectively.

Petitioner raises the following grounds for relief:

I.     THE TRIAL COURT ENGAGED IN AN UNREASONABLE APPLICATION OF FEDERAL LAW IN FAILING TO ANSWER THE JURORS' QUESTIONS CONCERNING THE ELEMENT OF "INTENT" AFTER THE JURORS SENT THE JUDGE A NOTE INDICATING CONFUSION OVER THIS PARTICULAR ELEMENT OF THE CHARGED OFFENSES, AND COUNSEL'S FAILURE TO OBJECT OR OTHERWISE ENSURE THAT THE JURORS' QUESTIONS WERE PROPERLY ANSWERED OR ADDRESSED CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL.

II.    PETITIONER WAS DENIED HIS RIGHT OF CONFRONTATION AND HIS RIGHT TO A FAIR TRIAL BY THE INTRODUCTION INTO EVIDENCE INADMISSIBLE HEARSAY, AND COUNSEL'S FAILURE TO OBJECT CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL.

III.   PETITIONER WAS DENIED A FAIR TRIAL WHEN THE PROSECUTOR IMPROPERLY IMPEACHED SEVERAL DEFENSE WITNESSES BY QUESTIONING THEM AS TO WHY THEY HAD NOT COME TO THE POLICE WITH THE INFORMATION THEY POSSESSED CONCERNING THE INCIDENT, THEREBY IMPLYING THAT THEIR TESTIMONY WAS FABRICATED, AND COUNSEL'S FAILURE TO OBJECT CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL.

IV.   THE PROSECUTOR VIOLATED PETITIONER'S DUE PROCESS RIGHTS BY MAKING AN IMPROPER CIVIC DUTY ARGUMENT TO THE JURY, AND COUNSEL'S FAILURE TO OBJECT CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL.

V.   THE EVIDENCE WAS INSUFFICIENT FOR A CONVICTION OF ASSAULT WITH INTENT TO MURDER.

VI.   THE COURT IMPOSED A SENTENCE UNDER IMPROPERLY INFLATED SENTENCING GUIDELINES.

VII.   THE TRIAL COURT VIOLATED PETITIONER'S DUE PROCESS RIGHTS BY SCORING SENTENCING GUIDELINE OFFENSE VARIABLES AND INCREASING THE STATUTORY SENTENCING GUIDELINE RANGE BASED ON DISPUTED FACTS WHICH THE PROSECUTOR DID NOT CHARGE AND PROVE BEYOND A REASONABLE DOUBT TO A JURY.

(Petition at 2-3, ECF No. 1, PageID.2-3).  Respondent contends that petitioner's first four claims are procedurally defaulted, and in the alternative lack merit; that the sixth claim does not present a cognizable basis for federal habeas relief; and that the remaining claims are without merit.  (Answer at 14-28, ECF No. 6, PageID.120-34).

Upon review and applying the standards established in the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA), I find that petitioner has failed to present a cognizable claim with respect to the sixth ground and, alternatively that it lacks merit.  I find that the remaining claims are without merit.

## Procedural History

### A.    Trial Court Proceedings

Petitioner's convictions for assault with intent to commit murder arise from a brawl that occurred outside the Eagles club in Lansing, Michigan, on June 2, 2007. Rudolfo "Rudy" Garcia and Gordon Dewey were each hit on the head by an individual wielding a wooden baseball bat while the two men were trying to break up a fight. Petitioner was tried before a jury for four days, beginning May 19, 2008, and concluding with the jury's verdict on May 23, 2008, finding him guilty of the aforementioned offenses.[1]

Rudy Garcia testified that he was attending a party at the Eagles club when, around midnight, he heard of a fight taking place outside the club. (Tr. I at 110-11, 118). He went outside and observed a number of different fights taking place in the parking lot. (*Id.* at 118-20). Mr. Garcia encountered Gordon Dewey in the parking lot, and the two attempted to stop the fighting. (*Id.* at 121-23). Soon thereafter, Mr. Garcia was hit in the face from behind. (*Id.* at 123). He was knocked unconscious and suffered a fractured jaw, a shattered lip, and the loss of five teeth. (*Id.* at 123-24, 126). Mr. Garcia did not see the person who hit him. (*Id.* at 125). He was taken to the hospital for treatment (receiving seven stitches) and released later that night. (*Id.* at 125-26).

---

[1]Transcripts of the trial proceedings will be designated as follows:
- May 19, 2008 (ECF No. 11): "Tr. I at __."
- May 20, 2008 (ECF No. 12): "Tr. II at __."
- May 22, 2008 (ECF No. 13): "Tr. III at __."
- May 23, 2008 (ECF No. 14): "Tr. IV at __."

Gordon Dewey testified that he was a trustee of the Eagles club, and that he was present the night of June 2, 2007, to oversee the operations at the club. (Tr. I at 158-59, 162). At around midnight, Mr. Dewey went out to the parking lot with the Eagles club president, Ernesto Gomez, to investigate a report of a fight. (*Id.* at 163-64). He was hit in the head from behind while attempting to break up a fight, but he did not see the person who hit him.[2] (*Id.* at 176-77). The blow left a dent and a cut in the side of his head, requiring a number of stitches. (*Id.* at 177-79, 181). Mr. Dewey was hospitalized for three days in the intensive care unit. (*Id.* at 181). After his discharge from the hospital, Mr. Dewey required the assistance of a home health-care aid. (*Id.* at 181-82). His injury later required surgery to relieve pressure on the brain. (*Id.* at 182).

Darian Bachman, Mr. Garcia's nephew, testified that he went to the party at the Eagles club the night of June 2, 2007, with his mother. (Tr. I at 199-201). At around midnight, he left the club with his mother and Mr. Garcia. (*Id.* at 201-02). While Mr. Garcia was trying to break up a fight in the parking lot, Mr. Bachman observed a man approach Mr. Garcia from behind and hit him on the head with a wooden bat. (*Id.* at 203-06). He noted that the perpetrator took a full-swing at Mr. Garcia's head: "like a baseball, full baseball swing." (*Id.* at 229). Mr. Bachman identified petitioner in court as the one who hit Mr. Garcia with the bat. (*Id.* at 207). He described the clothing petitioner was wearing at the time of the assault as a red T-shirt and a red

---

[2]Ernesto Gomez testified that he witnessed the assault, but he was unable to identify the assailant. (Tr. II at 423-24).

baseball hat.[3]  (*Id.* at 220).  Mr. Bachman testified that he had previously, and without hesitation, picked petitioner's photograph out of a six-person photo lineup, and that he was a hundred percent certain of the identification.[4]  (*Id.* at 210, 215, 229).

Lidia Bachman, one of Mr. Garcia's sisters and Darian Bachman's mother, testified that an Hispanic man came up to her and her sister at approximately 11:30 p.m. during the last dance after the lights had been turned up, and he put his arms on them.  (Tr. II at 254-59, 265).  She described the clothing the man was wearing as a red baseball cap, a red shirt, and some dark blue jeans.  (*Id.* at 262).  Ms. Bachman identified petitioner at trial as that man.  (*Id.* at 260).  She walked outside the club about fifteen minutes later and observed a "[v]ery chaotic" scene in which a number of individuals were fighting.  (*Id.* at 265-67).  Mr. Garcia was attempting to separate some of them.  (*Id.* at 268-69).  She later saw Mr. Garcia walking her son Darian toward her van while she was assisting someone else who was getting beaten up.  (*Id.* at 270).  She saw someone in the area her brother was located get hit with a bat, but she did not know at the time who had been hit, as the victim had his back

---

[3]John Merrifield testified that he attended the party at the Eagles club the night of June 2, 2007, and that shortly after midnight he observed an Hispanic young man, between the ages of 17 and 24, 5'5" and 160 pounds, running through the parking lot carrying "a little wooden bat . . . 30 inches long."  (Tr. II at 445-49).  He testified that the young man was wearing a red T-shirt and a red hat.  (*Id.* at 449).  He did not see the young man assault anyone.  (*Id.* at 448).

[4]Detective Ronald Seyka later testified that he had shown the photo lineup to Darian Bachman and, without disclosing the identity of the person Mr. Bachman identified, stated that Mr. Bachman made the identification without hesitation.  (Tr. III at 496).

turned to her. (*Id.* at 271-72). Ms. Bachman observed Mr. Dewey direct the man with the bat to leave. (*Id.* at 274). Immediately thereafter, when Mr. Dewey turned his attention to Ms. Bachman, the man hit Mr. Dewey on the head with the bat. (*Id.*). Mr. Dewey's eyes rolled back in his head. (*Id.* at 276). The perpetrator threw the bat down and ran away. (*Id.* at 281-82). Ms. Bachman identified petitioner as the person who hit Mr. Dewey with the bat. (*Id.* at 274). She had previously identified petitioner from a photo lineup.[5] (*Id.* at 284-85).

Maribell Garcia, another of Rudy Garcia's sisters, testified that she attended the June 2, 2007, party at the Eagles club. (Tr. II at 316-17, 321). She witnessed the assaults on both Rudy Garcia and Gordon Dewey. (*Id.* at 326, 332). She described how the perpetrator used a wooden baseball bat to strike each of them on the head. (*Id.* at 327-28, 332-33). Ms. Garcia noted that the perpetrator "was happy that he hit [Rudy Garcia] in the face and [Mr. Garcia] went down on his knees." (*Id.* at 328). She testified that the perpetrator was wearing dark jeans, a red shirt, and a baseball cap.[6] (*Id.*). Ms. Garcia identified petitioner in court as the perpetrator, and she previously identified him from a photo lineup during a meeting with the prosecutor. (*Id.* at 329-30, 339-41). She testified that petitioner dropped the bat and got into a car. (*Id.* at 333-34). She confronted petitioner about the fact that he had assaulted her brother,

---

[5]Detective Seyka later testified that he showed Ms. Bachman the photo lineup and, without disclosing who she identified, that she made her identification without hesitation. (Tr. III at 497).

[6]During cross examination, Maribell Garcia described the color of the baseball cap as black. (Tr. II at 355).

and she grabbed his hat, throwing it to the ground. (*Id.* at 333-35). Petitioner hit Ms. Garcia in the shoulder; he picked up his hat; and left in the car – at that time, Ms. Garcia could hear the sirens of the approaching police vehicles. (*Id.* at 336-38, 365).

Lisa Leal testified that she had an "open house" party at the Eagles club on June 2, 2007, for her daughter. (Tr. III at 522-23). There were approximately 300 people invited. (*Id.* at 524). As she was carrying items out to her car after the party (sometime after 11:30 p.m.), she observed people fighting in the parking lot. (*Id.* at 526-28). She called the police. (*Id.* at 528). Ms. Leal witnessed an individual she knew by the name "Govan" hit "an old man" with a bat. (*Id.* at 528-29). She did not know the name of the old man who was hit. (*Id.* at 529). Ms. Leal picked petitioner out of a photo lineup as the person she knew by the name Govan and who she had seen hit the old man with a bat. (*Id.* at 532-34).[7]

Ms. Leal's daughter, Raquel, testified that she knew petitioner by the name Govan, and that her mother had met him "a couple times" prior to the June 2, 2007, Eagles club party. (Tr. III at 558-64). She identified petitioner at trial as Govan. (*Id.* at 564-65).

Officer Aaron Terrill testified that he was dispatched to the Eagles club at approximately 12:20 a.m. regarding an assault with a bat. (Tr. I at 230-31). While Officer Terrill was interviewing Mr. Dewey, another officer found a wooden bat in the

---

[7]The transcript of Ms. Leal's testimony indicates only that she identified photo number 4 from the photo lineup, which was admitted as People's trial exhibit 7. (Tr. III at 532). Darian Bachman previously identified photo number 4 from exhibit 7 as that of petitioner. (Tr. I at 210, 229).

parking lot, which was placed into Officer Terrill's patrol car. (*Id.* at 236-37). The bat was introduced as evidence during his testimony. (*Id.* at 237-39).

Doctor Timothy Heilman is a neurosurgeon who treated Gordon Dewey. (Tr. II at 383-85). He testified that Mr. Dewey suffered a closed head injury in the form of a small acute subdural hematoma on the right side of the brain. (*Id.* at 385-87). He explained that a blood clot had formed between the brain and the skull that was putting pressure on the brain; if the blood clot became large enough, it could cause brain functions to shut down. (*Id.* at 387-89). Mr. Dewey had to return to the hospital shortly after his discharge due to the enlargement of the blood clot. (*Id.* at 388-90). Dr. Heilman performed a surgical procedure to release the pressure on Mr. Dewey's brain. (*Id.*). Dr. Heilman testified that hitting someone on the head with a baseball bat is the type of blunt force trauma that could cause serious and permanent injury as well as death. (*Id.* at 390-91).

The defense called six witnesses, including petitioner. Petitioner testified that he arrived at the Eagles club on June 2, 2007, around 11:00 p.m., and that he was wearing a white shirt, black pants and some black shoes. (Tr. III at 677-79). He denied wearing a red hat that night; he denied having a bat that night; he denied knowing, or having any animosity toward, either Rudy Garcia or Gordon Dewey; and he denied assaulting or attempting to murder either man. (*Id.* at 680-89).

Five defense witnesses corroborated petitioner's testimony that he was wearing a white shirt the night of the Eagles club party. (Galindez, Tr. III at 596-97; Moreno, Tr. III at 621-22; Meza, Tr. III at 637-38; R. Quinones, Tr. III at 653; and P. Quinones,

Tr. III at 669).  Four defense witnesses testified either that they did not see petitioner with a bat at the Eagles club or that they did not see him assault anyone.  (Galindez, Tr. III at 607; Meza, Tr. III at 639; R. Quinones, Tr. III at 657; and P. Quinones, Tr. III at 669).  None of these witnesses saw anyone else with a bat.  (*See id.*).

Lidia Bachman was called as a rebuttal witness.  She reiterated her previous testimony that petitioner put his arms on her during the last dance; that petitioner was involved in the fighting in the parking lot; and that petitioner hit Gordon Dewey in the head with a bat.  (Tr. III at 695-700).

At the conclusion of the trial on May 23, 2008, the jury found petitioner guilty of assault with intent to commit murder on Rudolfo ("Rudy") Garcia and guilty of assault with intent to commit murder on Gordon Dewey.  (Tr. IV at 764).  On June 25, 2008, petitioner was sentenced to concurrent terms of 168 to 360 months and 135 to 360 months, respectively.  (Sentencing Tr. at 18, ECF No. 15).

## B.    Post-Conviction Proceedings

Petitioner appealed his conviction and sentence to the Michigan Court of Appeals, raising all of his pending habeas claims.  The Court of Appeals affirmed his conviction and sentence in an unpublished opinion.  *People v. Mizori*, No. 286887, 2010 WL 376797 (Mich. Ct. App. Feb. 2, 2010).  The court denied petitioner's motion for reconsideration.  (March 30, 2010, Order, ECF No. 17).  The Michigan Supreme Court denied his application for leave to appeal.  (Sept. 9, 2010, Order, ECF No. 18).

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bales v. Bell*, 788 F.3d 568, 578 (6th Cir. 2015).

Moreover, "clearly established" federal law does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Accordingly, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013);

*Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## Discussion

Respondent argues that petitioner's first four habeas claims are procedurally defaulted.  She notes that petitioner failed to lodge a contemporaneous objection in the trial court; the Court of Appeals enforced the procedural rule; and the forfeiture is an adequate independent state ground for foreclosing review in a federal habeas petition. (Answer at 14-15, ECF No. 6, PageID.120-21) (*citing Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003)).  Respondent also contends that petitioner's procedural default cannot be excused, as he has failed to show "cause" for the default and he cannot demonstrate that a fundamental miscarriage of justice would occur absent a consideration of the merits of his claim.  (Answer at 15-16, ECF No. 6, PageID.121-22).

Both the Supreme Court and the Sixth Circuit have indicated, however, that this Court has discretion to ignore a procedural default and proceed directly to the merits of an apparently defaulted claim, when to do so would be more expeditious than an analysis of the complicated procedural default question.  *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Bales v. Bell*, 788 F.3d at 573; *Scott v. Houk*, 760 F.3d 497, 506 (6th Cir. 2014).  In the present case, the grounds raised by petitioner are meritless, so a detailed analysis of the complicated procedural default issues is unnecessary.

I.   **The Michigan Court of Appeals' Decision Regarding the Trial Court's Handling of the Jury Instructions Was Not Objectively Unreasonable.**

In his first claim of error, petitioner argues that he was denied a fair trial with respect to the manner in which the trial judge responded to a jury question. (Petitioner's Brief at 18-31, ECF No. 1-1, PageID.33-46).   The instruction at issue relates to the definition of intent to commit murder.

There is no general federal right to a properly instructed jury.   With few exceptions, the substance of jury instructions are a matter of state law.   *See Estelle v. McGuire*, 502 U.S. 62, 70-72 (1991).   Consequently, a federal court may grant habeas corpus relief based on errors in state jury instructions only in "extraordinary cases." *Daniels v. Lafler*, 501 F.3d 735, 741 (6th Cir. 2007) (citing *Lewis v. Jeffers*, 497 U.S. 762, 780 (1990)).   A habeas court may not grant relief on the basis of an allegedly erroneous instruction on evidence merely because it disagrees with the instruction. The only question in habeas corpus is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *accord Waddington v. Sarausad*, 555 U.S. 179, 191 (2009).

"It must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some constitutional right." *Estelle*, 502 U.S. at 72 (quotations and citation omitted).   "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the

-14-

context of the instructions as a whole and the trial record."  *Id.* (quoting *Cupp v. Naughten*, 414 U.S. at 147).

Here, during deliberations, the jury sent the trial judge a note asking for clarification of the definition of intent to commit murder.  The note stated, in pertinent part:

Does intent to murder mean:

1.  Thought ahead of time or during the incident 'This could/will kill the person & that is my intent'

    <u>or</u>

2.  The assailant was aware that their [sic] action <u>could</u> cause death & showed deferential regard for?

(ECF No. 17) (underlining in original).

In response, the trial judge sent the jury a written copy of the instructions he had previously given.[8]  The following are the instructions the trial judge gave the jury regarding the elements of assault with intent to commit murder:

To prove this charge the Prosecutor must prove each of the following elements beyond a reasonable doubt:

First, that the Defendant tried to physically injure [the alleged victim].

---

[8]The only contemporaneous record of the trial court's handling of the jury's question is the judge's handwritten note on the bottom of the jury's note, which states:  "Ct's instructions on elements are attached."  (ECF No.17).  During a post-trial hearing on the matter, the trial judge explained that he responded to the jury's question by providing the jury with the same instructions regarding the assault with intent to commit murder charge he gave them at the conclusion of the case.  (Motion for Review Hearing, Tr. at 5-6, Sept. 9, 2009, ECF No. 16).  The trial judge also noted that he had given the jury a tape-recorded copy of the instructions.  (*Id.* at 5).

> Second, that when the Defendant committed the assault he had the ability to cause an injury or at least believed he had the ability.
>
> Third, that the Defendant intended to kill the person he assaulted.

(Tr. IV at 755, 756-57).  The trial court instructed the jury that "a person's intent may be proved by what he said, what he did, how he did it or by any other facts and circumstances in our case."  (*Id.* at 751).

Petitioner concedes that these instructions were correct.  (Petitioner's Brief at 23-24, ECF No. 1-1, PageID.38-39).  Petitioner contends, instead, that the trial court had an affirmative obligation to provide additional instructions in response to the jury's question.  (*Id.*).

The Michigan Court of appeals rejected this argument.  The court concluded:

> The trial court must instruct the jury on the law of the case in a clear and understandable manner.  *People v. Henry*, 239 Mich. App. 140, 151; 607 N.W.2d 767 (1999).  Jury instructions are viewed as a whole to determine whether the trial court erred.  *People v. Canales*, 243 Mich. App. 571, 574; 624 N.W.2d 439 (2000).  "Even if somewhat imperfect, [jury] instructions do not create error if they fairly presented the issues for trial and sufficiently protected the defendant's rights."  *Id.*
>
> . . . .  The jury note does indicate that the jury needed clarification on the issue of intent.  The trial court attempted to alleviate this confusion by providing a written copy of the jury instructions.  This is common practice employed by trial courts when juries express confusion over an element of a charged offense.

*People v. Mizori*, 2010 WL 376797 at *6.

There is nothing erroneous about this decision.  Much less is it "an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

Petitioner cites to no Supreme Court decision – nor that of any court, for that matter – that supports his contention that the trial judge had an affirmative obligation to provide the jury with an explanation of the intent element beyond the instructions previously given.[9]  Instead, he cites to cases that simply stand for the proposition that a jury must be properly instructed.  (*See* Petitioner's Brief at 18, 22-24, 28-31, ECF No. 1-1, PageID.33, 37-39, 43-46).  The trial court did just that, as petitioner has conceded.

Moreover, the trial judge provided the jury with the option, and the instructions, to consider the lesser included offense of assault with intent to inflict great bodily harm.  (Tr. IV at 755-56, 757).  As the Michigan Court of Appeals noted, the coupling of these instructions with those for assault with intent to commit murder "should have been sufficient to clear up any previous misunderstanding on the part of the jury.  The fact that the jury did not request further clarification indicates that such was the case." *People v. Mizori*, 2010 WL 376797, at *7.  This is a reasonable conclusion.

## II.   The Michigan Court of Appeals' Decision Regarding Petitioner's Hearsay Claims Was Not Objectively Unreasonable.

Petitioner contends that the trial court admitted certain hearsay statements, which denied him his due process and confrontation rights.   These include: (1) Detective Seyka's testimony regarding information he had received from his supervisor concerning the identity of the alleged Eagles club assailant, including that

---

[9]"[N]ovelty alone – at least insofar as it renders the relevant rule less than 'clearly established' – provides a reason to reject it under AEDPA."  *Premo v. Moore*, 562 U.S. 115, 127 (2011); *see Glebe v. Frost*, 135 S. Ct. 429, 430-31 (2014); *Lopez v. Smith*, 135 S. Ct. 1, 3-5 (2014).

the individual had a first name of "Kavon" and that he had "some association with the Video 1 video store on Saginaw Street" (Tr. III at 490); (2) Detective Seyka's testimony regarding the lack of hesitation on the part of Lisa Leal, Darian Bachman, and Lidia Bachman in identifying the perpetrator from a photo lineup (Tr. III at 496-97); and (3) Raquel Leal's testimony that she had heard from her mother that an individual named "Govan" had hit an older man in the head with a bat, and that she knew petitioner by the name Govan (Tr. III at 563, 567). (Petitioner's Brief at 32, ECF No. 1-1, PageID.47). Petitioner's trial counsel did not object to any of this testimony.

The Michigan Court of Appeals rejected petitioner's contention that the challenged testimony was hearsay. With respect to Detective Seyka's testimony regarding the potential identification of the suspected assailant, the court concluded: "[T]he detective's testimony . . . did not constitute hearsay because it was not offered to prove the truth of the matter asserted. MRE 801(c). Instead, the testimony explained the course and chronology of the police investigation, specifically the creation of the photo lineup including [petitioner's] photo." *People v. Mizori*, 2010 WL 376797 at *1. As to Detective Seyka's testimony regarding Lisa Leal, Darian Bachman, and Lidia Bachman's lack of hesitation in identifying the perpetrator from a photo lineup, the court reasoned:

> The officer did not testify as to the witnesses' statements, but to the speed of their respective responses. In fact, the prosecutor specifically requested that the detective not say who each witness identified in the photo lineup; he asked only whether either witness hesitated in making their identification. Because the detective did not testify about another declarant's *statement*, his testimony cannot be considered hearsay.

*Id.* at *2 (citing MICH. R. EVID. 801(c)) (emphasis in original).

-18-

The Michigan Court of Appeals noted that Raquel Leal's testimony regarding her mother's statement concerning the identity of the person who assaulted an older man with a bat was a "closer question." *Id.* In concluding that the testimony was not hearsay, the court explained: "The testimony was offered, not to establish that 'Govan' struck the man, but rather to explain that the witness had introduced [petitioner] to her mother by that name." *Id.*

Petitioner argues that the Michigan Court of Appeals' holding is "clearly erroneous" with respect to all three of the challenged statements. (Petitioner's Brief at 34, ECF No. 1-1, PageID.49). He recites the definition of hearsay – the same definition used by the Michigan Court of Appeals – and argues that hearsay evidence is presumptively unreliable. (*Id.*). Petitioner cites to no case authority, much less any Supreme Court decision, that contradicts the Michigan Court of Appeals' hearsay analysis of the disputed testimony. He simply substitutes his conclusory statement that the disputed testimony is "clearly hearsay" without demonstrating how any of the out-of-court declarations was offered for the truth of the matter asserted. Having failed to show error in this regard, petitioner's arguments regarding the requirements for the exceptions to the hearsay rule need not be addressed.

Petitioner's contention that the disputed testimony violated his rights under the Confrontation Clause is without merit. There is nothing to suggest that any of the disputed testimony involved out-of-court statements that were testimonial in nature.

In *Crawford v. Washington*, the Supreme Court held that out-of-court statements that are testimonial in nature are barred under the Confrontation Clause

unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine.   541 U.S. 36, 68 (2004).[10]   While the Court did not provide a comprehensive definition of what is considered "testimonial," *see id.*, it explained: " 'Testimony[]' . . . is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'   An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."   *Id.* at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)).

Petitioner's reliance on *Davis v. Washington*, 547 U.S. 813 (2006), is misplaced. In *Davis*, the Supreme Court addressed whether a victim's responses to a 911 dispatcher's questions constituted testimonial statements.   *See* 547 U.S. at 817-18.   In concluding that the statements were nontestimonial, the Court noted:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.   They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the *primary* purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822 (emphasis supplied).

There is nothing in any of the disputed testimony to indicate that the declarant's out-of-court statement was made for the *primary* purpose of establishing facts for

---

[10]The Supreme Court's decision in *Crawford* abrogated the "particularized guarantees of trustworthiness" test of *Ohio v. Roberts*, 448 U.S. 56, 66 (1980).   *See Crawford*, 541 U.S. at 60.   Accordingly, petitioner's reliance on *Ohio v. Roberts* in this regard (*see* Petitioner's Brief at 35-36, ECF No. 1-1, PageID.50-51), is misplaced.

purposes of a later criminal prosecution. Detective Seyka received information from his supervisor regarding the identity of a suspect for the purpose of conducting the detective's investigation. (*See* Tr. III at 490 (explaining what steps he took as a result of receiving this information)). The detective's testimony regarding the speed with which certain witnesses picked a photo from a photo lineup did not include the identity of the person whose photo was picked – the prosecutor specifically instructed the detective not to do that. (*See* Tr. III at 496-97). In other words, the detective's testimony did not include any out-of-court statement. The statement Ms. Leal's mother made to her to the effect that "Govan" had hit an elderly man with a bat did not involve anyone in law enforcement or anyone charged with determining who was responsible for the assault at the Eagles club. *Cf. Crawford* 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.").

Plaintiff cites to no case – and this Court is aware of none – in which the Supreme Court has issued a decision clearly establishing that any of the disputed declarations constituted testimonial statements. Accordingly, the Michigan Court of Appeals' decision regarding petitioner's hearsay claims was not "contrary to," nor does it involve "an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Moreover, to the extent the trial court erred in admitting any of the disputed testimony, it was harmless. Violations of the Confrontation Clause are subject to harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). In

conducting this analysis, the court may consider a number of factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* Constitutional errors are deemed harmless on habeas review unless the petitioner establishes that they " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

In this case, petitioner cannot make the requisite showing. To the contrary, the disputed testimony regarding the identity of the assailant was cumulative, as other witnesses positively identified petitioner both in pretrial photo lineups and at trial. (*See* D. Bachman, Tr. I at 207, 210, 215, 229; L. Bachman, Tr. II at 274, 284-85; M. Garcia, Tr. II at 329-30, 339-41; L. Leal, Tr. III at 532-34). In addition, with the exception of Detective Seyak's supervisor, all the declarants of the out-of-court statements testified at trial and were subject to cross-examination. Accordingly, their out-of-court statements would not implicate the Confrontation Clause. *See, e.g., Katt v. Lafler*, 271 Fed. App'x 479, 484 (6th Cir. 2008). Moreover, the evidence of petitioner's guilt was overwhelming.

### III.   The Michigan Court of Appeals' Decision Regarding Petitioner's Claims of Prosecutorial Misconduct Was Not Objectively Unreasonable.

Petitioner contends that the prosecutor violated his due process rights by engaging in two types of misconduct: (1) questioning two defense witnesses as to why they had not previously gone to the police with the exculpatory information to which they testified at trial; and (2) asking the jury during closing argument to " '[s]end a message to [petitioner].  Tell him our society does not tolerate conduct like that.' " (Petitioner's Brief at 41-43, 46, ECF No. 1-1, PageID. 56-58, 61).  Petitioner asserts that, as to the former, the prosecutor impermissibly implied that the witnesses' had fabricated their testimony.  (*Id.* at 41, PageID.56).  He claims that, as to the latter, the prosecutor relied upon an improper "civic duty" argument.  (*Id.* at 45-46, PageID.60-61).

Petitioner argues that it was improper to question his witnesses about their failure to report the information to law enforcement, as the witnesses would have had no "natural tendency" to come forward to the police prior to trial; there was no evidence to suggest that either witness had such a close relationship with petitioner to know of the nature of the charges he was facing; and there was no evidence that either witness was connected to the assaults such as to indicate their testimony was self-serving.  (*Id.* at 43, PageID.58).  Petitioner cites to no case authority to support any of these contentions.  Instead, he relies on the broad, general principle that prosecutorial misconduct may result in a denial of a defendant's right to a fair trial.  (*See id.* at 44, PageID.59 (citing U.S. Constitution, Fifth Amendment; *Donnelly v. DeChristoforo*, 416

U.S. 637, 639 (1974); *Berger v. United States*, 295 U.S. 78, 88-89 (1935)).  Such a broad characterization is "far too abstract to establish clearly the specific rule [petitioner] needs." *Lopez v. Smith*, 135 S. Ct. at 4.

The scope of review in a habeas corpus action claiming prosecutorial misconduct is narrow.  "Petitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).  This Court does "not possess supervisory powers over state court trials." *Id.*  "It is the responsibility of the state courts to police their prosecutors; [this court has] no such authority." *Id.*  "Therefore, on habeas review, our standard is limited to 'the narrow one of due process.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (" '[T]he appropriate standard of review for ... a claim [of prosecutorial misconduct] on a [petition for a] writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.' ") (quoting *Darden*, 477 U.S. at 181).

To be grounds for habeas corpus relief, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181; *see Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012).  " '[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor,' because 'the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.' " *Beuke v. Houk*, 537 F.3d 618, 646 (6th Cir.  2008) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  Even if the prosecutor's conduct was improper or "universally condemned," the habeas court can

provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair. *See West v. Bell*, 550 F.3d 542, 565 (6th Cir. 2008). A petitioner must do more than show erroneous conduct. "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly v. De Christoforo*, 416 U.S. at 643); *see Parker v. Matthews*, 132 S. Ct. at 2153; *see also Bales v. Bell*, 788 F.3d at 578 ("The Supreme Court has made abundantly clear that we may only consider whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'") (quoting *Parker*, 132 S. Ct. 2153). Under AEDPA, this bar is heightened by the deference that the court must accord state-court rulings. *See Parker v. Matthews*, 132 S. Ct. at 2155.

The Michigan Court of Appeals rejected petitioner's arguments regarding the questioning of defense witnesses, noting:

> [I]n the instant case, both witnesses testified that they were with [petitioner] in the parking lot during the commotion outside and that [petitioner] never had a bat and never assaulted anyone. This testimony fits squarely within the circumstances outlined by *Grisham*, and the prosecutor was entitled to question the witnesses related to their failure to come forward earlier.

*People v. Mizori*, 2010 WL 376797, at *3; *see People v. Grisham*, 125 Mich. App 280, 287-88 (Mich. Ct. App. 1986) ("A person who was with a defendant at the time the crime occurred would necessarily have the knowledge that the defendant could not possibly have committed the charged offense. In such a case it is perhaps arguably

unreasonable for the witness to fail to bring such information to the attention of the state."). Petitioner has failed to cite any contrary Supreme Court decision.

With respect to the purported "civic duty" argument, petitioner cites to only one Supreme Court case: *Berger v. United States*, 295 U.S. at 88. This is the now-famous quote regarding the duty of the United States Attorney to engage in fair play during litigation. The prosecutor in petitioner's case did nothing that resembles the outrageous conduct of the prosecutor in the *Berger* case. Further, petitioner's reliance on *Berger* is misplaced because it was "decided on direct review where the Court could 'broad[ly] exercise [its] supervisory power.'" *Henley v. Bell*, 487 F.3d 379, 389 (6th Cir. 2007) (quoting *Darden*, 477 U.S. at 181). "The appropriate standard of review for such a claim [of prosecutorial misconduct] is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 642).

The Michigan Court of Appeals concluded that the prosecutor's comments "were not an appeal to the jurors to convict [petitioner] on the basis of their fear and prejudices, or an attempt to invoke sympathy for hypothetical victims," but rather, a proper urging "to hold [petitioner] accountable for his actions, because the evidence established his guilt of the charged offenses." *People v. Mizori*, 2010 WL 376797, at *4. Petitioner has offered nothing to suggest that the state court got this wrong; much less that its decision was objectively unreasonable.

Although circuit court precedent does not suffice for purposes of providing clearly established federal law under 28 U.S.C. § 2254(d)(1), it is appropriate to note

that the Sixth Circuit rejected a similar claim of prosecutorial misconduct in *Byrd v. Collins*, 209 F.3d 486, 538-39 (6th Cir. 2000).  In *Byrd*, the prosecutor argued to the jurors that they should impose the death penalty to fulfill their societal duty, quoting from the opinion in *Gregg v. Georgia*, 428 U.S. 153 (1976), regarding the purpose of capital punishment.  *Byrd*, 209 F.3d at 538.  The Court of Appeals observed:  "It is not clear that this comment was even improper, and certainly does not render Petitioner's entire trial fundamentally unfair."  *Id.* at 539.  In addition, the Sixth Circuit noted that, even under its much broader supervisory powers, " '[u]nless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible.' "  *Id.* (quoting *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991)).

**IV.  The Michigan Court of Appeals' Decision Regarding Petitioner's Ineffective Assistance of Counsel Claim Was Not Objectively Unreasonable.**

Petitioner argues that his trial counsel was constitutionally ineffective in failing to object to the following:  the trial judge's response to the jury's note (Claim I); the admission of the purported hearsay testimony (Claim II); the cross-examination of defense witnesses concerning their failure to previously report exculpatory information to the police (Claim III); and the prosecutor's closing argument (Claim IV). (Petitioner's Brief at 30-31, 39-40, 44, 49, ECF No. 1-1, PageID.45-46, 54-55, 59, 64). The Michigan Court of Appeals, in rejecting these arguments, concluded that any such objection would have been meritless.  *People v. Mizori*, 2010 WL 376797, at *2, 4, 7.

The court also noted that, with respect to the hearsay issue, petitioner could not establish the prejudice prong as the evidence of guilt was overwhelming. *Id.* at 2.

Because the state court decided petitioner's claims of ineffective assistance of counsel on their merits, the decision must be afforded deference under AEDPA. *See Burt v. Titlow*, 134 S. Ct. 10, 15-16 (2013); *Harrington v. Richter*, 562 U.S. at 98-102. To receive habeas relief, petitioner must demonstrate that the state court's decision was contrary to, or represented an unreasonable application of, *Strickland v. Washington*. *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Hence, it is not enough to convince the federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, petitioner must show that the state court "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell*, 535 U.S. at 699; *see Campbell v. Bradshaw*, 674 F.3d 578, 586-87 (6th Cir. 2012). This creates a "high burden" for petitioner. *See Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006); *see also Hodges v. Colson*, 727 F.3d 517, 534 (6th Cir. 2013). "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Supreme Court decisions describe this as "the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard." *Knowles*, 556 U.S. at 123; *see Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*). The question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Premo v. Moore*, 562 U.S. 115, 123 (2011); *see McGowan v. Burt*, 788 F.3d 510, 515 (6th Cir. 2015).

The decision of the Michigan Court of Appeals is not unreasonable.  In *Strickland v. Washington*, the Supreme Court established a two-prong test for determining whether trial counsel was constitutionally ineffective:  first, whether counsel's performance was "deficient" – requiring a "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; second, whether "the deficient performance prejudiced the defense."  466 U.S. 668, 687 (1984).

As to the first prong, the Supreme Court noted that "[j]udicial scrutiny of counsel's performance must be highly deferential. . . . [and that] a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id*. at 689 (citations omitted).  With respect to the second prong, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*.  Failure to satisfy either prong is sufficient to deny habeas relief. *See id*. at 697.

As is evident from the analysis of the merits of the first four habeas claims, petitioner has failed to establish that his trial counsel's performance was constitutionally deficient in failing to make objections regarding the matters raised in those claims.  Any such objection likely would have been futile.  Moreover, I agree with the Michigan Court of Appeals that the strength of the evidence in this case is such that petitioner cannot meet the high standard of demonstrating prejudice.

V. **The Michigan Court of Appeals' Decision Regarding the Sufficiency of the Trial Evidence Was Not Objectively Unreasonable.**

Petitioner contends that there was insufficient evidence to support his convictions for assault with intent to commit murder. (Petitioner's Brief at 50-55, ECF No. 1-1, PageID.65-70). Specifically, he argues that there was a lack of evidence of intent to murder. (*Id.* at 50, PageID.65).

The Michigan Court of Appeals rejected this argument, concluding:

"Because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence of intent to kill is sufficient."

There was evidence presented at trial that defendant wielded a baseball bat and deliberately struck two victims in the head from behind with that bat and that neither victim was engaged in fighting at the time of the attack. One party guest who witnessed the attack on one of the victims testified that defendant used a "full baseball swing" when he struck the man. The location of the blows, the use of a weapon that could easily inflict a mortal wound, and the fact that both unarmed victims were blindsided when they were trying to stop the fighting was sufficient to infer that defendant intended to kill.

*People v. Mizori*, 2010 WL 376797, at *4 (quoting and citing *People v. McRunels*, 237 Mich. App. 168, 181 (1999)).

Petitioner now relies on the Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979).[11] In *Jackson*, the Court noted that "the relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, any

_____

[11]Petitioner's reliance on Fifth, Seventh, and Ninth Circuit opinions regarding the *Jackson* analysis (Petitioner's Brief at 50-51, ECF No. 1-1, PageID.65-66) is misplaced. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *See Lopez v. Smith*, 135 S. Ct. at 3; *Bailey*, 271 F.3d at 655.

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 319 (citation omitted). The Court explained that "[t]his familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.*

The Michigan Court of Appeals ruled directly on this claim. Review of this issue must be conducted under the AEDPA standard, which the Sixth Circuit has described as "very deferential." *Durr v. Mitchell*, 487 F.3d 423, 448 (6th Cir.2007). Review of challenges to the sufficiency of evidence under the *Jackson v. Virginia* standard proceeds under the "unreasonable application" prong of AEDPA. *See Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008). Such an argument is properly understood as an allegation that the state court's decision resulted in an unreasonable application of *Jackson v. Virginia. See Eady v. Morgan*, 515 F.3d 587, 601-02 (6th Cir. 2008). Review in such cases "is limited to determining whether the evidence was so overwhelmingly in favor of the petitioner that it compelled a verdict in his or her favor." *Thompson v. Bock*, 215 F. App'x 431, 436 (6th Cir. 2007). This standard presents a "nearly insurmountable hurdle" for the habeas petitioner. *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011). "Adding to this extremely high bar are the stringent and limiting standards of AEDPA ." *Id.*

The Sixth Circuit has summarized the "double layer of deference" given the state-court decisions in the context of sufficiency-of-the-evidence claims:

> Thus, after AEDPA, federal courts reviewing state habeas claims accord a double layer of deference:
>
>> First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979).  In doing so, we do not re-weigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir.1993).  Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution.  Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable.

*White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009) (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir.2009)).

Under Michigan law, intent to commit murder may be inferred from circumstantial evidence.  *People v. McRunels*, 237 Mich. App. at 181; *see DeLisle v. Rivers*, 161 F.3d 370, 389 (6th Cir. 1998) ("Premeditation and intent to kill may be inferred from circumstantial evidence." (citing *People v. Youngblood*, 165 Mich. App. 381, 387 (Mich. Ct. App. 1988).

Darian Bachman identified petitioner as the one who hit Rudy Garcia on the head with a bat. He noted that petitioner took a full-swing at Mr. Garcia's head: "like a baseball, full baseball swing." (Tr. I at 207, 229). Maribell Garcia testified that petitioner used a wooden baseball bat to strike each Mr. Garcia and Gordon Dewey on the head. (Tr. II at 327-28, 332-33). She noted that petitioner "was happy that he hit [Rudy Garcia] in the face and [Mr. Garcia] went down on his knees." (*Id.* at 328).

 Mr. Garcia testified that he was knocked unconscious and he suffered a fractured jaw, a shattered lip, and the loss of five teeth. (Tr. I at 123-24, 126). Mr. Dewey testified that the blow with the bat left a dent and a cut on the side of his head, requiring a number of stitches. (*Id.* at 177-79, 181). Mr. Dewey was hospitalized for three days in the intensive care unit. (*Id.* at 181). He later needed surgery to relieve the pressure on his brain. (*Id.* at 182).

Doctor Heilman, a neurosurgeon, testified that Mr. Dewey suffered a closed head injury in the form of a small acute subdural hematoma on the right side of the brain. (Tr. II at 383-87). He opined that hitting someone on the head with a baseball bat is the type of blunt force trauma that could cause serious and permanent injury as well as death. (*Id.* at 390-91).

Given the testimony of the eyewitnesses in this case, which included descriptions of petitioner's use of the bat and the location of the blows, along with the opinion of the neurosurgeon, there was sufficient evidence to infer an intent to kill. More to the point, the Michigan Court of Appeals' decision regarding the sufficiency of the evidence was not an unreasonable application of the *Jackson v. Virginia* standard. 28 U.S.C. § 2254(d)(1).

## VI.    Petitioner Fails to Present a Cognizable Habeas Claim Regarding the Trial Court's Scoring of His Sentencing Guidelines.

Petitioner contends that the trial court violated his due process rights by assessing 25 sentencing-guidelines points based on the court's finding that Mr. Dewey suffered a "life threatening" injury.  (Petitioner's Brief at 56-63, ECF No. 1-1, PageID.71-78).  Petitioner argues, specifically, that the due process violation resulted from a lack of evidence to support the trial court's factual finding in this regard.  (*Id.* at 56-57, PageID.71-72).  Respondent asserts that this claim implicates only state law, and, accordingly, it is not a cognizable basis for federal habeas relief.  (Answer at 27, ECF No. 6, PageID.133).

At the sentencing hearing, the trial court was required to assess sentencing-guidelines points for an offense variable relating to the degree of physical injury suffered by the victim:  0 points for no physical injury, 5 points for bodily injury not requiring medical treatment, 10 points for bodily injury requiring medical treatment, and 25 points for a life threatening or permanent incapacitating injury.  *See* MICH. COMP. LAWS 777.33(1).  The trial judge assessed 10 points for Mr. Garcia's injury and 25 points for Mr. Dewey's injury.  (Sentencing Tr. at 6-7, ECF No. 15).  The judge based his assessment regarding Mr. Dewey's injury on the testimony of the neurosurgeon who opined that Mr. Dewey's injury, if untreated, could cause death.  (*Id.* at 7).

Petitioner relies solely on the Supreme Court's opinion in *Townsend v. Burke*, 334 U.S. 736 (1948), to support his contention that this issue implicates the Due Process Clause.  (Petitioner's Brief at 56, PageID.71).  In *Townsend*, the defendant pled

guilty to two counts of robbery and two counts of burglary, and he was immediately sentenced to prison, all without benefit of counsel. 334 U.S. at 737. The sentencing judge relied on a number of significant errors in the defendant's criminal history in deciding the sentence. *Id.* at 739-40. The Supreme Court held that the "careless or designed pronouncement of sentence on a foundation so extensively and materially false, which the prisoner had no opportunity to correct by the services which counsel would provide, [] renders the proceedings lacking in due process." *Id.* at 741. The Court also noted, however, that "mere error in resolving a question of fact," even by an uncounseled defendant, would not necessarily indicate a lack of due process. *Id.* The Court explained: "Fair prosecutors and conscientious judges sometimes are misinformed or draw inferences from conflicting evidence with which we would not agree. But even an erroneous judgment, based on a scrupulous and diligent search for truth, may be due process of law." *Id.*

Respondent, for her part, ignores petitioner's due process argument and, instead, recites the "well-established" principle that federal courts may not grant habeas relief solely on the basis of an error in the application of state law. (Answer at 27, ECF No. 6, PageID.133 (citing *Estelle v. McGuire*, 502 U.S. 62 (1991); *Smith v. Phillips*, 455 U.S. 209 (1982); *Rose v. Hodges*, 423 U.S. 19 (1975)). Respondent's assertion, while undoubtedly correct, is unhelpful here. The issue is whether any purported error regarding petitioner's sentencing rises to the level of a due process violation. The Due Process Clause of the Fourteenth Amendment is decidedly a matter of federal law. *See, e.g., Smith v. Phillips*, 455 U.S. at 221.

The *Townsend* decision is a thin reed upon which to base petitioner's habeas claim, however. Nothing in the petition for habeas relief in this case suggests the scope and seriousness of the errors that occurred in *Townsend*. A significant distinction is found in the fact that petitioner was represented by competent counsel throughout the proceedings in his case, including the sentencing hearing. Accordingly, the petitioner, having failed to allege a prima facie due process violation relating to the trial court's scoring of the sentencing guidelines, fails to raise a cognizable habeas claim.

Moreover, petitioner's claim is without merit. In rejecting petitioner's argument on direct appeal, the Michigan Court of Appeals concluded:

> [T]he trial court heard testimony from the neurosurgeon asked to provide a consult for one of the victims that the victim's subdural hematoma, which resulted from the blow defendant inflicted to the victim's head, put pressure on the brain and that, if not treated properly, such an injury can impair brain function or cause death. This testimony was sufficient to support the trial court's scoring. . . .

*People v. Mizori*, 2010 WL 376797, at *5 (citing *People v. Hornsby*, 251 Mich. App. 462, 468 (2002)).

In light of the evidence produced at trial, it cannot be said that the state court's decision regarding the application of the "life threatening" injury assessment was "based upon an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). Gordon Dewey testified that the blow with the bat left a dent and a cut on the side of his head, and that he was hospitalized for three days in the intensive care unit. (*Id.*

Tr. I at 177-79, 181).  A neurosurgeon, testified that Mr. Dewey suffered a closed head injury, the type of which could cause death.  (Tr. II at 383-87, 390-91).[12]

Petitioner's argument that the trial court erred in assessing 25 sentencing-guidelines points based on a finding that he had the intent to kill (Petitioner's Brief at 59-62, ECF No. 1-1, PageID.74-77) is wholly without merit.  The jury found beyond a reasonable doubt that petitioner intended to kill both Messieurs Garcia and Dewey.

### VII.  Michigan's Indeterminate Sentencing System Does Not Violate the Sixth Amendment.

Petitioner argues that the trial court violated his due process rights by relying upon judicial fact finding that increased his sentencing exposure.  (Petitioner's Brief at 64-69, ECF No. 1-1, PageID.79-84).  In essence, petitioner contends that Michigan's statutory sentencing guidelines violate the Sixth Amendment, at least as they were applied to his case.  He is demonstrably wrong.

This Court is bound by the Sixth Circuit's decision in *Chontos v. Berghuis*, which forecloses this claim.  *See* 585 F.3d 1000, 1002 (6th Cir. 2009).  Petitioner's assertion that this Court should, instead, follow various state supreme court decisions regarding their respective state sentencing systems (Petitioner's Brief at 68-69, ECF No. 1-1, PageID.83-84) is a non sequitur.  *See* 28 U.S.C. § 2254(d) (limiting the source of law to cases decided by the United States Supreme Court).

---

[12]Petitioner cites no authority for his contention that the sentencing enhancement requires that the injury actually be life threatening at the time it is inflicted.  (*See* Petitioner's Brief at 58, ECF No. 1-1, PageID.73).  Accordingly, even assuming he has raised a cognizable habeas claim, it cannot be said that the state trial and appellate courts' decisions were objectively unreasonable.

In order to demonstrate entitlement to federal habeas relief, petitioner was required to show that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Petitioner has failed to meet that burden

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied because all grounds raised by petitioner lack merit.

Should the Court deny the petition, it must determine whether a certificate of appealability should be granted. 28 U.S.C. § 2253(c)(2). A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467.

Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 529 U.S. at 484. "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S.

322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of petitioner's claims.  *Id.*

Examining petitioner's claims under the standard in *Slack*, reasonable jurists would not conclude this Court's assessment of petitioner's claims to be debatable or wrong.  Accordingly, I recommend that the Court deny petitioner a certificate of appealability.

Respectfully submitted,

Date:  July 8, 2016                    /s/ Phillip J. Green
                                       PHILLIP J. GREEN
                                       United States Magistrate Judge

## NOTICE TO THE PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).  General objections do not suffice.  *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).